NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230551-U

NO. 4-23-0551

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 12, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| PARKER J. ERXLEBEN, | ) | No. 22CF528 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's convictions of two counts of aggravated battery to a child.

¶ 2    Following a jury trial, defendant, Parker J. Erxleben, was found guilty of two counts of aggravated battery to a child (720 ILCS 5/12-3.05(b)(1) (West 2022)). The trial court sentenced him to concurrent terms of 13 years in prison. On appeal, defendant contends (1) his trial counsel provided ineffective assistance by failing to object when the State asked the court to find one of its witnesses was an expert in the jury's presence and (2) his constitutional right to confront the witnesses against him was violated when the State presented testimony that a nontestifying witness told police officers he saw defendant handle the victim roughly. We affirm.

¶ 3                              I. BACKGROUND

¶ 4        In January 2023, defendant was charged in a superseding indictment with three counts of aggravated battery to a child (*id.*). The State alleged defendant caused great bodily harm to R.E. by breaking her right arm (count I), breaking her left arm (count II), and breaking her ribs (count III).

¶ 5                                A. Jury Trial Evidence

¶ 6        A jury trial began in March 2023.

¶ 7                                1. *Melissa Callaway*

¶ 8        Melissa Callaway testified defendant is the father of her two daughters, A.E., born in November 2020, and R.E., born in May 2022. They moved from Virginia to Illinois in July 2022, when R.E. was two months old. During the events at issue, they lived with Melissa's grandmother, Audrey Howell, and her husband, Curtis Howell. Melissa's cousin Connor, Audrey's foster son Demarius Bent, and three dogs also lived in the house.

¶ 9        On Friday, September 9, 2022, A.E. and R.E. had child wellness checkups with their doctor. Melissa testified R.E. did not indicate any discomfort or cry when the doctor manipulated her arms and legs. R.E. arched her back, but Melissa thought it could have been caused by "colic *** or reflux." R.E. seemed "normal" while Melissa and Audrey shopped following the doctor's appointment. Later that night, Melissa bathed R.E. and put her to bed with no indication of any injury or discomfort. R.E. slept normally, only waking up once or twice for feedings during the night.

¶ 10       The next morning, defendant watched A.E. and R.E. at home while Audrey drove Melissa to work. On the way, Melissa decided not to go to work and instead went to another store to ask if they were hiring. Melissa and Audrey then met Curtis at a restaurant for breakfast. They were at the restaurant for 45 minutes to an hour. When they arrived home after breakfast,

defendant and his parents were getting ready to leave to go grocery shopping. R.E. was in her car seat in the car and defendant was fastening A.E. into her seat. R.E. was crying, so they decided she should stay at home with Melissa while defendant, his parents, and A.E. went shopping.

¶ 11 Later that afternoon, R.E. started crying more than normal and Melissa put her in her swing. Melissa noticed R.E. was only using one arm to play with the mobile attached to the swing. When Melissa lifted the arm R.E. was not using, she made a "high pitch cry." Melissa sent a message to Audrey asking her to get a bandage wrap for R.E.'s arm. Melissa testified defendant later wrapped R.E.'s arm with the bandage.

¶ 12 Melissa testified she and defendant took R.E. to the hospital the following day, a Sunday, but they decided not to go into the emergency department because it was busy and made Melissa anxious. They were planning to take R.E. to her primary care doctor on Monday, but a "state worker" came to the house Sunday night, apparently after being alerted by a family member about R.E.'s injury. Melissa told the worker she had taken R.E. to the hospital and R.E. was diagnosed with a hairline fracture to her arm. Melissa later admitted to the worker that she lied about going to the hospital. Melissa testified she lied because she was afraid of the "family being broken apart" and of how defendant would react if she told the worker the truth.

¶ 13 Melissa testified the worker directed her to take R.E. to the hospital. After an X-ray of R.E.'s arm revealed a spiral fracture, R.E. was admitted to the hospital and her right arm was placed in a cast. When Melissa questioned defendant, he denied picking R.E. up by her arms and stated Demarius could have caused the injury. Melissa testified Demarius did not babysit or care for R.E. During a subsequent text message conversation, Melissa asked defendant what she should say to the police and defendant told her to blame Demarius.

¶ 14        Melissa later spoke to a police detective at the hospital and learned R.E. had also suffered additional breaks to her arm and broken ribs. As a possible explanation, Melissa told the detective she may have fallen asleep while breastfeeding and rolled over onto R.E. Melissa denied ever handling R.E. roughly. She asserted she was the primary caregiver for the children when she was not working. Defendant had asked Melissa not to leave him alone with R.E. when she was crying or fussy. Melissa testified defendant would become "overwhelmed or frustrated" when R.E. cried.

¶ 15                    2. *Audrey Howell*

¶ 16        Audrey Howell testified she is Melissa's grandmother. She testified R.E. could "hardly move" without crying later in the day on Saturday. She observed defendant get angry or frustrated with the children on several occasions. She also observed defendant "roughly handle" R.E. by picking her up by the arm, "trying to say how flexible kids are."

¶ 17                    3. *Curtis Howell*

¶ 18        Curtis Howell testified Melissa is his stepgranddaughter. He testified R.E. was screaming and crying after they returned from breakfast that Saturday morning. Curtis testified defendant became angry when he had responsibility for watching the two children, and he saw defendant pick R.E. up by her arms and almost drop her when he was angry.

¶ 19                    4. *Detective Andrew Thompson*

¶ 20        Pekin Police Detective Andrew Thompson testified he specialized in child victim crimes. On September 12, 2022, he received a message from an investigator with the Illinois Department of Children and Family Services, indicating R.E. had been admitted to a hospital with a broken arm. R.E. had been diagnosed with a spiral fracture to her right humerus. From his training, Thompson knew the infliction of a spiral fracture requires "a tremendous amount of

force and torque," especially when involving a young child, because their bones are very flexible and difficult to break. Thompson also learned R.E. had "multiple rib fractures in various stages of healing both front and back" and fractures to her upper and lower left arm.

¶ 21　　　　In his investigation, Thompson met with Melissa and observed R.E. at the hospital. He testified R.E. began screaming when Melissa picked her up. Melissa stated she did not observe any accident or physical abuse that could have caused R.E.'s injuries but offered "speculation," including that she may have rolled over on R.E. after falling asleep while breastfeeding. Melissa also stated she thought Demarius may have stepped on R.E. while she was asleep on her stomach on the front porch. Based on his experience and consultation with Dr. Channing Petrak, Thompson testified those possible events could not have caused the injuries observed in this case.

¶ 22　　　　Thompson also interviewed the other household members. Demarius, who was a suspect at the time, denied harming R.E. and disclosed "rough handling" of R.E. by defendant. Defense counsel interposed a hearsay objection when the prosecutor asked if Demarius "describe[d] what he witnessed." The trial judge overruled the objection but instructed the jury that the testimony was being offered only to explain the course of Detective Thompson's investigation. The prosecutor then asked, "What did Demarius describe as far as rough handling by the defendant," and Detective Thompson testified Demarius "stated that he had witnessed [defendant] pick [R.E.] up by the ribs like under the arms roughly."

¶ 23　　　　Thompson further testified Audrey and Curtis Howell both denied causing R.E. harm. Audrey stated she had witnessed defendant "hurt" R.E., and Curtis stated he had observed defendant "cause harm physically" to her. Melissa's cousin, Connor, denied having any physical contact with R.E. and stated he did not observe anyone else harm her. Detective Thompson also

confirmed R.E. was seen by her primary care doctor on Friday, September 9, 2022, and the doctor did not observe any issue with R.E.'s arm after manipulating her extremities. The doctor diagnosed R.E. with acid reflux because she seemed uncomfortable and irritable when her torso was manipulated.

¶ 24 Detective Thompson testified defendant initially tried to blame Demarius for R.E.'s injuries. Defendant then stated he almost dropped R.E. on one occasion, but he caught her by the arm just before she hit the ground. Defendant also stated he had tripped over the dog and toys several times while holding R.E. He did not fall directly on R.E., but she was pinned against his side, potentially causing her broken arm. When Detective Thompson told defendant about R.E.'s broken ribs, defendant admitted he grabbed her around the chest area and felt something pop. He also stated he forcefully put R.E. into her swing on one occasion when he was frustrated. Defendant told Thompson he became angry and frustrated sometimes when watching both children. After initially denying it, defendant acknowledged he was alone with the children on the morning of Saturday, September 10, 2022, and R.E. was crying when he was getting ready to run errands with the children and his parents. Defendant did not claim he saw anyone else physically harm R.E. However, after he was arrested following the interview, defendant stated Demarius and Melissa were responsible for R.E.'s injuries. Defendant stated he observed Melissa "bear hug" R.E. on the evening of Friday, September 9, 2022, and he heard "popping."

¶ 25 5. *Dr. Channing Petrak*

¶ 26 Dr. Channing Petrak testified she is the medical director of the Pediatric Resource Center, a program associated with the University of Illinois College of Medicine. The prosecutor elicited substantial testimony concerning Dr. Petrak's qualifications in general pediatrics and child abuse pediatrics and then moved to certify her as an expert witness in those fields. After

defense counsel asserted he had no objection, the trial court stated in the jury's presence "the witness is qualified to testify as an expert."

¶ 27          Dr. Petrak testified she was contacted by St. Francis Hospital in September 2022 to consult on R.E.'s injuries. Before examining R.E., Dr. Petrak reviewed her medical records and X-rays and learned R.E. was three months old. The State introduced the X-rays into evidence. Dr. Petrak explained the injuries shown on them, including "a spiral angulated displaced fracture of the shaft of the humerus" on R.E.'s upper right arm. Dr. Petrak explained the fracture line spiraled around the bone, indicating the injury was caused by significant force in a torsion movement on the bone. Dr. Petrak explained infants' bones are flexible and do not break as easily as those of older children or adults. Given R.E.'s age, Dr. Petrak opined the spiral fracture was consistent with physical abuse and inconsistent with an accidental cause unless there was a very specific accidental explanation.

¶ 28          The X-rays also showed a healing fracture to R.E.'s left humerus and a "bowing fracture" of R.E.'s left forearm, typically caused in an infant by "[s]queezing the forearm, squeezing and bending." "[S]ignificant force" was required to cause a bowing fracture. Dr. Petrak opined the bowing fracture was inflicted, not caused accidentally. The X-rays further showed R.E. had suffered several posterior and lateral rib fractures. The fractures were in various stages of healing, indicating they did not occur close to the same time. Dr. Petrak testified the rib fractures were consistent with direct, significant force, such as compression or "a forceful squeezing of the chest," and there was no accidental explanation for those injuries in this case. Dr. Petrak concluded, "given the multiple fractures in different stages of healing, it was [her] opinion that they were inflicted and due to child physical abuse over time."

¶ 29                              6. *Audio Recordings of Telephone Calls*

¶ 30          The State also introduced into evidence transcripts of the recordings of telephone calls defendant made to his mother from jail. In the calls, defendant stated he was tired of hurting himself and others and asserted he intended to get help. On one of the calls, defendant's mother stated, " '[Y]ou almost killed her. She could have died.' "

¶ 31                              7. *Jason Erxleben*

¶ 32          After the State rested, defendant called his father, Jason Erxleben, to testify. Jason testified he and his wife, Shawna Erxleben, arrived at defendant's residence at approximately 10 to 10:30 a.m. on Saturday, September 10, 2022, to pick defendant up to run errands. When they arrived, R.E. was sitting in her car seat on the porch. Defendant placed the car seat in the car next to Shawna. Shawna was playing and talking with R.E. while defendant and Jason looked at defendant's vehicle. Jason testified R.E. "looked fine" and only cried when she was startled by a car door being closed. After Melissa returned home, they left R.E. with her and went to run their errands.

¶ 33                              8. *Shawna Erxleben*

¶ 34          Shawna Erxleben testified she is defendant's mother. After she and her husband arrived at defendant's residence that Saturday morning, she sat in the vehicle next to R.E. for about 20 to 25 minutes. During that time, R.E. seemed fine and was smiling. She only cried when defendant closed the car door, but she settled down in about five minutes. After Melissa arrived, they left R.E. with her and went to run errands. Shawna testified R.E. did not appear to be injured in any way that day.

¶ 35                              B. Jury Deliberations and Verdict

¶ 36          During deliberations, the jury requested transcripts of defendant's telephone calls with his mother while he was in jail. With the agreement of the parties, the trial court provided

the transcripts to the jury. The jury subsequently asked for a clarification of the term "knowingly." With the agreement of the parties, the court informed the jurors to follow the instructions they were given. Next, the jury asked to review Detective Thompson's interview with defendant, and the court allowed the jury to view the interview.

¶ 37 The following morning, the jurors reported they were deadlocked. The trial court instructed the jury to keep deliberating. The jury later sent another note asking about the definition of "knowingly," and the court, with the agreement of the parties, gave a supplemental instruction. The jurors later asked a question about the charges related to the injuries to R.E.'s ribs, and the court again informed them to follow the jury instructions they were given. At 2:44 p.m. on the second day of deliberations, the jury returned verdicts of guilty on count I (injury to right arm) and count III (injury to ribs), and not guilty on count II (injury to left arm).

¶ 38                                      C. Sentencing

¶ 39 Defendant did not file a posttrial motion. The trial court sentenced him to 13 years' imprisonment on each count, to be served concurrently.

¶ 40 This appeal followed.

¶ 41                                      II. ANALYSIS

¶ 42 On appeal, defendant contends (1) his trial counsel provided ineffective assistance by failing to object to the trial court declaring in the jury's presence that Dr. Petrak was an expert in the fields of general and child abuse pediatrics and (2) his constitutional right to confront the witnesses against him was violated when the State presented testimony that Demarius Bent, a nontestifying witness, told Detective Thompson he saw defendant handle R.E. roughly.

¶ 43           A. Trial Court's Expert Witness Finding in Jury's Presence

¶ 44　　　　Defendant first argues his attorney provided ineffective assistance by allowing the trial court to declare Dr. Petrak was an expert in front of the jury without objecting. In support of his argument, defendant relies upon this court's decision in *People v. Pingelton*, 2021 IL App (4th) 180751, ¶ 50, which states, "when a trial court makes the determination that a witness is qualified to give opinion testimony, it is never necessary or appropriate for the court to use the term 'expert' in front of the jury." Defendant maintains he was prejudiced by the court's declaration of Dr. Petrak's qualification as an expert witness in the jury's presence because it conferred additional credibility on her testimony and may have inappropriately influenced the jury's decision. Defendant concludes he is entitled to a new trial due to his attorney's deficient representation.

¶ 45　　　　The State responds counsel did not provide deficient performance by failing to object to the trial court declaring Dr. Petrak an expert witness in the jury's presence. At trial, defendant only argued someone else caused R.E.'s injuries. His defense did not require objecting to Dr. Petrak's status as an expert witness. By not objecting, defendant demonstrated to the jury that he acknowledged the extent of R.E.'s injuries and was only questioning the State's evidence as to who caused them. The State concludes defense counsel did not provide deficient performance because objecting would not have advanced his defense. The State also argues defendant has failed to show he was prejudiced by his attorney's performance because the alleged error was isolated and the evidence establishing defendant's guilt was strong, if not overwhelming.

¶ 46　　　　Claims of ineffective assistance of counsel are analyzed under the two-pronged framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To establish a claim of ineffective assistance of counsel, a defendant must

demonstrate (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *People v. Domagala*, 2013 IL 113688, ¶ 36.

¶ 47 Under the deficient performance prong, "the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as 'counsel' guaranteed by the sixth amendment." *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 40 (citing *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). "Effective assistance of counsel refers to competent, not perfect representation." (Internal quotation marks omitted.) *People v. Evans*, 209 Ill. 2d 194, 220 (2004). A defendant must also overcome the strong presumption that counsel's conduct may have been the product of sound trial strategy. *Merriweather*, 2022 IL App (4th) 210498, ¶ 40 (citing *Evans*, 186 Ill. 2d at 93).

¶ 48 To satisfy the prejudice prong, the defendant must demonstrate a reasonable probability exists that, absent counsel's errors, the result of the proceeding would have been different. *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A "reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome. *Id.* A failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 49 Defendant's ineffective assistance of counsel claim is based on this court's decision in *Pingelton*. In that case, the court "recommend[ed] against" the common practice of the trial court recognizing a witness as an expert in the jury's presence. *Pingelton*, 2021 IL App (4th) 180751, ¶ 49. After discussing relevant authority on the subject, this court concluded trial courts should not use the term "expert" in referring to a witness in front of a jury because it "confers the judicial imprimatur of authority and credibility, which thereby inappropriately augments the witness's stature while simultaneously detracting from the court's position of

neutrality." *Id.* ¶ 52. Instead of having the trial court call the witness an "expert" in front of the jury, this court determined counsel should either address the matter before trial or ask to approach the bench to confirm an adequate foundation has been established for the witness to give opinion testimony. *Id.* ¶ 55. *Pingelton* held the "suggested limitation" on the use of the term "expert" applies only to the trial court, not to the parties, because the "problem to be avoided is the court's putting its judicial imprimatur upon the background or testimony of any purported expert." *Id.* ¶ 57.

¶ 50        The *Pingelton* court, however, concluded defense counsel did not provide deficient performance by failing to object to expert testimony offered by two emergency room physicians. *Id.* ¶ 68. In pertinent part, the court concluded counsel's preferred trial strategy was to use the physicians' testimony to attempt to undermine the testimony of the complainants because neither physician found evidence of physical trauma to corroborate the complainants' testimony. *Id.* ¶ 70.

¶ 51        We note the *Pingelton* court's disapproval of the trial court's use of the term "expert" in the jury's presence was not unanimous. In his special concurrence, Justice Harris agreed with the decision to affirm but did not "endorse the majority's critique of a trial judge finding, in front of a jury, that a witness is qualified to testify as an expert." *Id.* ¶ 78 (Harris, J., specially concurring).

¶ 52        Without expressing an opinion on the analysis in *Pingelton*, we hold defense counsel did not provide deficient representation in this case by failing to object to the trial court declaring Dr. Petrak an expert in the jury's presence. In this case, Dr. Petrak detailed R.E.'s injuries and expressed her opinion that they were not caused accidentally. Defendant acknowledged the extent and severity of the injuries to R.E. and did not dispute that they were

- 12 -

inflicted rather than caused accidentally. Indeed, defendant conceded in his closing argument he was "not here to rebut" Dr. Petrak's testimony that the injuries were due to "inflicted abuse." Instead, he attempted to deflect blame for the injuries to someone else in the household and argued the State failed to prove he caused the injuries beyond a reasonable doubt.

¶ 53    Because defendant did not dispute the substance of Dr. Petrak's testimony, defense counsel had no reason to object to the trial court declaring her an expert in front of the jury. Dr. Petrak was not an adverse witness to defendant in this case. Her testimony did not diminish or undermine his defense. Thus, defendant had no reason to object, even if the court calling Dr. Petrak an expert in front of the jury may have resulted in lending her testimony additional weight or credibility. In fact, an objection by defense counsel may have caused the jury to incorrectly assume Dr. Petrak's testimony harmed the defense. Given the facts of this case, we conclude counsel did not provide deficient representation by not objecting to the court declaring Dr. Petrak an expert in the jury's presence. Accordingly, defendant's claim of ineffective assistance of counsel fails.

¶ 54                                B. Hearsay Testimony

¶ 55    Defendant contends his right to confront the witnesses against him was violated when Detective Thompson testified Demarius Bent stated he saw defendant handle R.E. roughly. Defendant argues the testimony was inadmissible hearsay because it was offered to prove the truth of the matter asserted, not to show the course of the police investigation. Defendant maintains the error in admitting the hearsay testimony was compounded when the prosecutor asserted in closing argument that witnesses observed defendant handling R.E. in a rough manner.

¶ 56    Defendant acknowledges he forfeited this claim by failing to include it in a written posttrial motion. Generally, both an objection at trial and a posttrial motion raising the

- 13 -

claim are required to preserve an issue for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

Defendant, however, argues his forfeited claim may be reviewed under the plain error rule or,

alternatively, as ineffective assistance of counsel for failure to preserve the issue for review.

Defendant concludes he was prejudiced by the error because the evidence was closely balanced

and the violation of his right to confrontation denied him a fair trial.

¶ 57      The State responds the disputed testimony was not inadmissible hearsay but was

properly admitted to explain the steps taken by police officers in the course of the investigation.

Additionally, the prosecutor's closing argument did not compound any error because the

prosecutor was referring to "testifying witnesses," including Audrey and Curtis Howell, who

testified they saw defendant handle R.E. in a rough manner and lift her up by her arms. The

State, therefore, contends no error occurred to support a finding of plain error or ineffective

assistance of counsel. Further, the State argues, any possible error did not prejudice defendant

because the evidence against him was overwhelming and the alleged error was not so serious as

to deprive him of a fair trial.

¶ 58      The plain error rule allows appellate review of unpreserved claims when either

"(1) a clear or obvious error occurred and the evidence is so closely balanced that

the error alone threatened to tip the scales of justice against the defendant,

regardless of the seriousness of the error, or (2) a clear or obvious error occurred

and that error is so serious that it affected the fairness of the defendant's trial and

challenged the integrity of the judicial process, regardless of the closeness of the

evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 59      As explained above, a claim of ineffective assistance of counsel requires a

defendant to establish (1) counsel's performance was deficient and (2) the deficient performance

prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36. Deficient performance occurs when an attorney's performance falls below an objective standard of reasonableness. *Henderson*, 2013 IL 114040, ¶ 11. To establish prejudice, a defendant must show there is a reasonable probability of a different outcome absent counsel's alleged errors. *People v. Hale*, 2013 IL 113140, ¶ 18.

¶ 60     When addressing alternative claims of plain error and ineffective assistance of counsel, reviewing courts first determine whether the defendant has established a clear or obvious error. " 'Absent a clear or obvious error ***, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture.' " *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 78 (quoting *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179).

¶ 61     Defendant argues the disputed testimony was inadmissible hearsay and was erroneously admitted to explain the course of the police investigation. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Testimony about an out-of-court statement is not hearsay if it is used for a purpose other than to prove the truth of the matter asserted. *People v. Simms*, 143 Ill. 2d 154, 174 (1991). A police officer may testify about the steps taken in an investigation when the testimony is "necessary and important to fully explain the State's case to the trier of fact." *Id.* "Testimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *Id.* However, " '[o]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information.' " *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107 (quoting *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992)).

¶ 62    In *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989), this court discussed the reasoning for admitting out-of-court statements to explain the course of a police investigation and their potential misuse, as follows:

" 'In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.' " (quoting McCormick's Handbook of the Law of Evidence § 249 (Edward W. Cleary ed., 3d ed. 1984) (hereinafter McCormick on Evidence)).

¶ 63    Given the substantial concerns about this type of testimony, this court suggested the following procedure for determining whether it should be admitted:

"When an objection was first raised to [the officer] testifying about what he was told by the confidential informant, the court should have conducted a hearing out of the presence of the jury to determine both the *scope* of these third-party out-of-court statements and the *need* for the jury to hear them. Had such a hearing been conducted in this case, the court could have directed that the improper portions of [the officer's] testimony be deleted, thereby permitting the State to provide its legitimate explanations for police conduct, while protecting the defendant against prejudicial hearsay statements." (Emphases in original.) *Id.* at 1005.

¶ 64       In this case, after defense counsel objected, the trial court failed to conduct a *Cameron* hearing on the admissibility of Detective Thompson's testimony about Demarius Bent's out-of-court statement. Even in the absence of an objection, this court has held a trial court may conduct a *Cameron* hearing *sua sponte*. *Boling*, 2014 IL App (4th) 120634, ¶ 115. The court should have conducted a hearing to determine the scope and need for this testimony to explain the course of the police investigation.

¶ 65       We agree with defendant that the trial court erred in admitting the disputed testimony because it went beyond what was necessary to explain the course of the police investigation. Detective Thompson clearly intended to speak with each of the occupants of the household, including defendant, in his investigation of R.E.'s injuries. It was not necessary to admit Demarius's out-of-court statements alleging defendant was rough with R.E. and that he "pick[ed] [R.E.] up by the ribs like under the arms roughly," to explain why Thompson proceeded to speak with defendant. This case demonstrates the concerns often associated with this type of evidence due to its slight probative value and its potential for a prejudicial effect. See *Cameron*, 189 Ill. App. 3d at 1004 (quoting McCormick on Evidence § 249 (Edward W. Cleary ed., 3d ed. 1984)).

¶ 66       Nonetheless, the record in this case does not support a finding of plain error in the trial court's admission of the disputed testimony or ineffective assistance of counsel due to defense counsel's failure to preserve the issue for review. To find plain error under the first prong, the court must determine "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Piatkowski*, 225 Ill. 2d at 565. In determining whether evidence is closely balanced, a reviewing court must conduct a qualitative,

commonsense evaluation of the totality of the evidence within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53.

¶ 67 The evidence in this case was not closely balanced. The evidence established R.E. was approximately three months old and had suffered multiple severe injuries. After detailing and explaining R.E.'s extensive injuries, Dr. Petrak testified, "given the multiple fractures in different stages of healing, it was [her] opinion that they were inflicted and due to child physical abuse over time." The timeline of this case indicates R.E. had a wellness checkup with a doctor on Friday, September 9, 2022. According to Melissa's testimony, R.E. did not indicate any discomfort when the doctor manipulated her arms and legs. Melissa testified R.E. seemed "normal" after the doctor's visit, without any indication of an injury or discomfort, and she slept normally that night. The following morning, defendant was left alone with R.E. and A.E. The injury to R.E.'s arm was discovered by Melissa later that afternoon. Audrey Howell testified R.E. could "hardly move" without crying later in the day on Saturday.

¶ 68 Melissa also testified defendant asked her not to leave him alone with R.E. when she was crying or fussy and that he would become "overwhelmed or frustrated" when R.E. cried. Audrey and Curtis Howell similarly testified defendant would become angry or frustrated with the children, and they observed him pick R.E. up by her arms. Defendant made several admissions in this case, including his statements to Detective Thompson that he almost dropped R.E. on one occasion but caught her by the arm and that he grabbed R.E. around the chest and felt something pop. In a telephone call to his mother from jail, defendant stated he was tired of hurting himself and others and stated he intended to get help. Defendant's mother stated, " '[Y]ou almost killed her. She could have died.' "

¶ 69 Defendant argues the prosecutor compounded the error in this case by emphasizing the improper testimony in her closing argument. The record shows the prosecutor argued, "[T]estifying witnesses who [were] asked about witnessing [defendant] handle [R.E.] roughly or inappropriately all stated they had seen [defendant] not only handle [R.E.] in a rough manner but describe him grabbing and lifting [R.E.] up by an arm." The complained-of portion of the prosecutor's closing argument was directed at the statements of "testifying witnesses" who observed abuse, not at Demarius's out-of-court statement. As the State observes, Audrey and Curtis Howell testified they saw defendant handle R.E. roughly and lift her up by an arm. The prosecutor's closing argument did not refer to Demarius's out-of-court statement that defendant "pick[ed] [R.E.] up by the ribs like under the arms roughly." Thus, defendant's contention that the prosecutor's closing argument compounded the error is not persuasive.

¶ 70 Defendant also contends the length of the jury deliberations and the notes sent by the jury show the evidence was closely balanced. Defendant asserts the jury deliberated for almost eight hours, twice asked for a definition of "knowingly," requested to review evidence again, and was deadlocked at one point.

¶ 71 "[T]he length of time a jury deliberates is not always an accurate indicator of whether the evidence was closely balanced." *People v. Walker*, 211 Ill. 2d 317, 342 (2004). We note this case involved separate counts for injuries to R.E.'s right arm (count I), left arm (count II), and ribs (count III). Dr. Petrak testified the injuries were inflicted at different times and were at various stages of healing. The State presented substantial medical evidence and evidence on the cause of the injuries. The length of the jury's deliberations was not excessive given the number of separate charges and the evidence presented. Likewise, we believe the jury's requests to review certain evidence and for clarification of the term "knowingly" only show their

diligence in discharging their important duties in this case. See *People v. Minniweather*, 301 Ill. App. 3d 574, 580 (1998) (stating jury's questions during deliberations indicated the jury "took its job seriously and conscientiously worked to come to a just decision"). With the agreement of the parties, the trial court allowed the jury to review the requested evidence and gave the jury a supplemental instruction for the term "knowingly." The record in this case indicates the jury carefully reviewed the evidence and applied the law to the facts.

¶ 72         We conclude the State presented strong evidence of defendant's guilt in this case. The disputed testimony reciting Demarius's out-of-court statement that defendant was rough with R.E. and "pick[ed] [her] up by the ribs like under the arms roughly" was brief and isolated. Additionally, the out-of-court statement was not particularly prejudicial given defendant's own admission to Detective Thompson that he grabbed R.E. around the chest and felt something pop. The out-of-court statement was essentially cumulative of defendant's own admission to Detective Thompson. We conclude the evidence was not "so closely balanced that the error alone threatened to tip the scales of justice against the defendant." See *Piatkowski*, 225 Ill. 2d at 565. Accordingly, defendant has not established his claim of plain error under the first prong.

¶ 73         To establish second-prong plain error, a defendant must show the error affected the fairness of the trial and challenged the integrity of the judicial process. See *id.* Illinois courts have equated second-prong plain error with "structural error," which "necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence." *People v. Moon*, 2022 IL 125959, ¶ 28. The United States Supreme Court has recognized errors as "structural" only in a " 'very limited class of cases.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). "Confrontation clause violations *** are not 'structural defects in the constitution of the trial mechanism' that affect '[t]he entire conduct of the trial from beginning to

end.' " *People v. Patterson*, 217 Ill. 2d 407, 424 (2005) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). Rather, this type of error "is more accurately described as a 'trial error,' *i.e.*, an 'error which occurred during the presentation of the case to the jury.' " *Id.* at 424-25 (quoting *Fulminante*, 499 U.S. at 307-08).

¶ 74　　　　Even if, as defendant argues, the admission of the disputed statement resulted in a violation of the confrontation clause, it is not subject to second-prong plain error review because it is a trial error, not a structural defect in the trial process. The error did not deprive defendant of a fair trial or challenge the integrity of the judicial process. Accordingly, it does not rise to the level of second-prong plain error.

¶ 75　　　　Finally, defendant cannot establish his claim of ineffective assistance of counsel. Although defense counsel provided deficient performance by failing to properly preserve this error for review, a finding of prejudice sufficient to support a claim of ineffective assistance of counsel requires the defendant to establish a reasonable probability of a different result absent counsel's error. See *Hale*, 2013 IL 113140, ¶ 18. As previously explained, the evidence in this case was not closely balanced and the erroneously admitted testimony was not particularly prejudicial. The isolated out-of-court statement was essentially cumulative of defendant's own admission to Detective Thompson. Defendant has not shown a reasonable probability of a different result if the testimony had been excluded.

¶ 76　　　　In sum, we conclude defendant has not established either plain error or ineffective assistance of counsel in the admission of Detective Thompson's testimony reciting the out-of-court statement by Demarius. Accordingly, defendant's convictions are affirmed.

¶ 77　　　　　　　　　　　　　　III. CONCLUSION

¶ 78　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 79        Affirmed.